**SAMINI BARIC KATZ LLP**
Bobby Samini, Esq. (SBN 181796)
Michael Katz, Esq. (SBN 181728)
Steve Baric, Esq. (SBN 200066)
Nicole C. Prado, Esq. (SBN 269833)
John S. Oney IV, Esq. (SBN 338596)
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone: (949) 724-0900
Fax: (949) 724-0901
Email: bobby.samini@sbklawyers.com
Email: michael.katz@sbklawyers.com
Email: steve.baric@sbklawyers.com
Email: nicole.prado@sbklawywers.com
Email: john.oney@sbklawyers.com

*Attorneys for Plaintiffs Jane Roe 1
and Jane Roe 2*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROE 1, an individual, JANE ROE 2, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL CHURCHES OF CHRIST, INC., a California nonprofit corporation; THE INTERNATIONAL CHRISTIAN CHURCH, INC., a California nonprofit corporation; HOPE WORLDWIDE, LTD., a Delaware nonprofit corporation; THOMAS ("KIP") McKEAN, an individual; MARK WILKINSON, an individual; CINDY WILKINSON, an individual; MARTY WILKINSON, an individual; NANCY WILKINSON, an individual; | Case No. 2:23-cv-00765<br><br>**COMPLAINT FOR:**<br>1. **SEXUAL ASSAULT OF A MINOR**<br>2. **VIOLATION OF PENAL CODE 647.6(A)(1)**<br>3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>4. **NEGLIGENT HIRING, SUPERVISION, AND RETENTION**<br>5. **NEGLIGENT SUPERVISION OF A MINOR**<br>6. **FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEQ. BASED ON VICARIOUS** |

MIKE TALIAFERRO, an individual;
MISSION POINT CHRISTIAN
CHURCH, a Texas nonprofit
corporation; and DOES 1 through 100,
inclusive,

        Defendants.

**LIABILITY**
7. **NEGLIGENCE**
8. **VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ("RICO") ACT 18 U.S.C. § 1962(C)**
9. **SEXUAL BATTERY IN VIOLATION OF CAL. CIV. CODE § 1708.5**
10. **GENDER VIOLENCE IN VIOLATION OF CAL. CIV. CODE § 52.4**

**JURY TRIAL DEMANDED**

**[REMAINDER PAGE INTENTIONALLY LEFT BLANK]**

Plaintiffs JANE ROE 1 and JANE ROE 2 (collectively, "Plaintiffs") hereby submit this Complaint pursuant 18 U.S.C. §§ 1961 *et. seq.*, the California Civil Code and the California Penal Code, under federal question and supplemental jurisdiction against Defendants INTERNATIONAL CHURCHES OF CHRIST, INC., THE INTERNATIONAL CHRISTIAN CHURCH, INC., HOPE WORLDWIDE, LTD., MERCYWORLDWIDE, THOMAS "KIP" McKEAN, MARK WILKINSON, CINDY WILKINSON, MARTY WILKINSON, NANCY WILKINSON, MIKE TALIAFERRO and MISSION POINT CHRISTIAN CHURCH, and all other named and unnamed defendants (collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.     This case involves an **inhumane abuse enterprise of epic proportions** that has been perpetrated and actively concealed by a **ruthless den of sexual predators** wherein, through systemic physical force and psychological manipulation, **women and children as young as 3 years old were repeatedly raped and sexually abused with impunity by trusted church members**.

## JURISDICTION AND VENUE

2.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

3.     This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Additionally, the "nerve centers" of the International Churches of Christ, Inc., and The International Christian Church, Inc. are both within the jurisdictional

boundaries of the Central District of California.

## THE PARTIES

### A. PLAINTIFFS

5.     Plaintiff Jane Roe 1 ("Jane Roe 1") is a citizen and resident of San Antonio, Texas. Jane Roe 1 was a citizen of the United States of America, and resident of the State of Texas at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

6.     Plaintiff Jane Roe 2 ("Jane Roe 2") is a citizen and resident of Antonio, Texas. Jane Roe 2 was a citizen of the United States of America, and resident of the State of Texas when she was victim and survivor of Defendants' sexual abuse and trafficking.

## DEFENDANTS

7.     Defendant International Churches of Christ, Inc. (the "ICOC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. The ICOC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. The ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

8.     Defendant The International Christian Church, Inc. ("ICC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. ICC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. ICC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings

and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

9.     Defendant HOPE worldwide ("HOPE") was founded in 1994 by the ICOC and is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business registered with the Secretary of State for the State of California located at 9449 Balboa Ave. Ste. 311, San Diego, California 92117. HOPE purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California.

10.     Defendant Thomas "Kip" McKean ("Kip" or "McKean"), upon information and belief, is a United States citizen, currently residing in Pacific Palisades, California. At all times relevant to the events that form the basis of this Complaint, Defendant Kip was a member of ICOC's Los Angeles regional branch, and later, the City of Angels International Church of Christ in Los Angeles, California. Defendant Kip resided in California for extended periods while conducting business in California on behalf of Defendant ICOC and Defendant ICC.  Defendant Kip's supervision, direction, and control over Defendants forms the basis of his personal liability.

11.     Defendant Mark Wilkinson ("Mark"), upon information and belief, is a United States citizen, currently residing in Lubbock, Texas. At all times relevant to the events that form the basis of this Complaint, Mark was/is a member and leader of ICOC's San Antonio Texas branch. His abuse of Plaintiffs combined with his supervision, direction, and control over Defendants forms the basis of his personal liability. Mark is the husband of Cindy Wilkinson and the father of Marty and Nancy Wilkinson.

12.     Defendant Cindy Wilkinson ("Cindy"), upon information and belief, is a United States citizen, currently residing in Lubbock, Texas. At all times relevant to the events that form the basis of this Complaint, Cindy was/is member and leader of ICOC's San Antonio Texas branch. Her abuse of Plaintiffs combined with her supervision, direction, and control over Defendants forms the basis of her personal

liability. Cindy is the wife of Mark Wilkinson and the mother of Marty and Nancy Wilkinson.

13.    Defendant Marty Wilkinson ("Marty"), upon information and belief, is a United States citizen, currently residing in San Antonio, Texas. At all times relevant to the events that form the basis of this Complaint, Marty was/is a member and leader of ICOC's San Antonio Texas branch. His abuse of Plaintiffs combined with his supervision, direction, and control over Defendants forms the basis of his personal liability. Marty is son of Mark and Cindy Wilkinson and the brother of Nancy Wilkinson.

14.    Defendant Nancy Wilkinson ("Nancy"), upon information and belief, is a United States citizen, currently residing in Lubbock, Texas. At all times relevant to the events that form the basis of this Complaint, Nancy was/is a member of ICOC's San Antonio Texas branch. Her abuse of Plaintiffs combined with her supervision, direction, and control over Defendants forms the basis of her personal liability. Nancy is daughter of Mark and Cindy Wilkinson and the sister of Marty Wilkinson.

15.    Defendant Mike Taliaferro ("Mike"), upon information and belief, is a United States citizen, currently residing in San Antonio, Texas. At all times relevant to the events that form the basis of this Complaint, Mike was a member and leader of ICOC's San Antonio Texas branch and later Defendant Mission Point Christian Church, which he currently leads. His abuse of Plaintiffs combined with his supervision, direction, and control over Defendants forms the basis of his personal liability. Marty is son of Mark and Cindy Wilkinson and the brother of Nancy Wilkinson.

16.    Defendant Mission Point Christian Church ("Mission Point") was founded in or about 1991 by the ICOC and is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Texas, with a principal place of business registered with the Secretary of State for the State of Texas located at 618 Northwest Loop 410 #207, San Antonio, TX 78216. On information and belief, Mission

Point is an affiliate of ICOC. Mission Point purposefully conducts substantial religious and affiliated programs and activities in San Antonio, Texas.

17. Plaintiffs are ignorant of the true names of the defendants sued herein as Does 1-100, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend the Complaint to allege their true names when ascertained. Plaintiffs allege that, at all relevant times herein, Does 1-100 were the co-conspirators, subsidiaries, employees, employers, and agents of constituent members of Defendants herein. Plaintiffs allege that each of the fictitiously named defendants is legally responsible for the actions forming the basis of this Complaint and that Plaintiffs' losses and damages are the result of their wrongful conduct.

## GENERAL ALLEGATIONS
## INTRODUCTION TO DEFENDANTS' METICULOUSLY CRAFTED, HEINOUS ABUSE ENTERPRISE

18. Defendants, at the direction and control of McKean and Lucas, have collectively exploited everything good and noble in their trusting and loyal members by callously robbing them of their childhood innocence through **psychological coercion and manipulation; pervasive sexual abuse of children as young as 3 years old; and shameful financial abuse**. Each of the foregoing abuses were actively concealed by Defendants to avert discovery by child protective services and the police.

19. Founded in 1993, ICOC has become an intricate and intentionally confusing "network of over 700 non-denominational churches in about 150 countries." Throughout its history, ICOC has gone by other names, such as: the Boston Movement, the Discipling Movement, the Crossroads Movement, and Multiplying Ministries, for example. Often, the city in which a local assembly is located is added to the name, for example, Milwaukee Church of Christ and Sarajevo Church of Christ."

20. To ensure Defendants' exploitative conduct remains unchecked, Defendants have utilized their vast resources to **silence any internal dissidents through physical and sexual violence**, and if necessary, vexatious litigation.

21.    Defendants have created a "David and Goliath" scenario, where the few members that have spoken up over the last four decades, have been swiftly suppressed. Defendants have intentionally created a system of exploitation that extracts any and all value it can from members and non-members while shielding their illicit conduct from discovery by outsiders.

22.    Defendants coerced parents/members to remain silent regarding the abuses their children suffered through payoffs and non-disclosure agreements. It is the vast financial base that has insulated Defendants from exposure, and provides legitimacy and license to Defendants' shameful system of exploitation and abuse. The **communal ostracization and isolation from the outside world has caused highly debilitating emotional and mental harm, and in some cases, suicide**.

23.    Defendants operate with a strict and documented **discipleship pyramid**, where every member has an elder disciple member "over them" that acts as a mentor and jailor. This carefully crafted infrastructure enables both churches to execute and maintain a **micromanaged degree of control over every aspect of each member's life**. Members are systematically deindividualized, only to endure communal isolation from the world at large.

24.    Only "disciplers" were allowed to provide any counseling to church members, however, they were not licensed counselors or mental health practitioners. Abuses were reported to the "disciplers", however, no investigations were initiated and no reports were made to the police by Defendants, and each of them.

25.    Defendants created a religious requirement that mandated victims to confess "sins" on a daily basis, however, "disciplers" would share the specifics of these "sins" with other groups and leaders in a juvenile gossip-like culture that permeated the church. This allowed Defendants to use Plaintiffs' abuses as emotional blackmail within the community.

26.    In addition to the "discipler" structure, Defendants were/are characterized by **indoctrination of rigid fundamentalist teachings, unyielding compliance with**

**instruction and strict social separatism**. Every new member undergoes a rigid conversion process that is tantamount to **systemic brainwashing**, called the "First Principles" and once a new member agrees to all indoctrination related teachings, they must be baptized in water and completely devote their life to the church.

27. Defendants taught their members that only fellow church members are "true disciples" of Jesus who will be rewarded with a place in heaven in the afterlife; non-members will not go to heaven and are not "true disciples" of Jesus. Indeed, this **insider-outsider dichotomy** allowed scores of sexual predators within the churches to abuse children without fear of criminal prosecution. Defendants created a **highly exclusive environment for its members** wherein they were/are prohibited from marrying anyone outside the church and the church must approve all marriages, which ultimately gives the church an incredible degree of control over every aspect of members' lives.

28. Moreover, Defendants indoctrinated their parishioners to forgive any slight, no matter how severe, and "move on" without reporting such abuses. Defendants teach/taught that because "no one is free from sin," judging the conduct of another, no matter how villainous, is beyond the right of any individual. Further, **parishioners must protect God's church and modern-day movement from all challenges**.

## THE CHURCHES' EARLY ORGANIZATIONAL STRUCTURES CREATED AN IMMOVABLE FOUNDATION THAT FACILITATED THE SYSTEMIC PHYSICAL AND SEXUAL ABUSE OF CHILDREN

29. Founded in Boston in 1979 under the "Boston Movement" moniker by Thomas "Kip" McKean ("Thomas McKean", "Kip" or "McKean") (and 29 other members) through secession from the Church of Christ in Gainesville, Florida. The fledgling "church" quickly sought new members upon formation and enjoyed considerable expansion and success. After the Boston Movement obtained religious and corporate recognition as the International Church of Christ in the 1980's, **ICOC swiftly grew into a multinational movement**. According to the ICOC's self-reported

statistics, the ICOC is a body of approximately 700 cooperating Christian non-denominational congregations spread across 144 nations, with more than 120,000 members worldwide.

30.     In 1979, the Church of Christ that helped spawn ICOC and eventually ICC, was jointly led by Charles Howard Lucas ("Chuck" or "Chuck Lucas"), a licensed psychologist at the time, and McKean. It is commonly understood that **McKean, was acutely aware of, the physical, psychological, and sexual abuses Lucas and other church members wrought upon children and adult parishioners**.

31.     Academic writings, journals, recovered correspondence, newspaper articles, eyewitness accounts, and publications like the book, "Toxic Christianity," which was written by former ICOC leading members under the pseudonym "Mr. X".[1] These are but a fraction of the litany of information depicting the practices and abuses Defendants institutionalized to the point of normalcy within the church.[2]

32.     ICOC was incorporated in California in December 1994. Its Articles of Incorporation filed with the California Secretary of State stated that upon dissolution, "the remaining assets of this Corporation shall be distributed to…the individual congregations that are part of the worldwide fellowship of churches of Christ (which are affiliated with the Corporation), if they qualify as distributes under the provisions of this Section."

33.     The International Christian Church (ICC) was founded by Kip McKean in 2006 after he was forced out of ICOC. ICC was registered in California as a nonprofit religious corporation in October 2006, and as of December 2022, ICC listed 104 affiliate churches on its website. Articles of Incorporation filed by ICC with the California Secretary of State included references to affiliates of ICC. One part stated that upon dissolution of ICC, "the assets of this Corporation shall be distributed to other

---

[1] Toxic Christianity. It's widely believed that Rick Bauer co-published with another church leader under the pseudonym "Mr. X" and can be accessed in its entirety here: http://www.reveal.org/library/theology/Toxic.pdf

[2] Writings from former members and ICOC leaders, in addition to information about the ICOC/ICC churches organizational structure, religious dogma, and their associated analyses can be found at http://www.reveal.org/library/psych/stumpk.html

nonprofit funds, foundations or corporations affiliated with the International Christian Church.[34]

34.     Defendants are independently operating a **highly profitable pyramid scheme supported by a web of paper corporations and sham 501(c)(3) entities**, culminating in **hundreds of millions of dollars in illicit gains**. The full extent of ICOC and ICC's profiteering is unknown, especially given the tithing and labor contributions ICOC and ICC routinely coerce from their members.

35.     ICOC and ICC also benefitted from millions in governmental support through SBA loans, authorized under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[5] Through their veiled abuse of the corporate form and systematic financial exploitation of their members, Defendants have created a cash cow built upon complex layers of deceit and manipulation of their vulnerable members.

36.     One example of a tax-exempt corporation under the ICOC/ICC corporate umbrella is the sham charity organization Defendant HOPE, which has generated over $100 million in tax-free revenue over the last six years.

37.     Chuck Lucas led the CrossRoads Church of Christ in Gainesville, Florida, before he was paid off to leave Florida and start another church in approximately 1986, with the explicit goal that **Chuck would no longer be associated with the ICOC because of his deviant behavior**. ICOC and McKean strategically downplayed Chuck's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough,

---

[3] Between April 2020 and February 2021, 18 branches of the ICC received Paycheck Protection Program (PPP) loans. These loans totaled $287,490, and a total of $290,040 was forgiven, including accrued interest.

[4] Churches associated with the ICOC appeared to be incorporated into separate entities, according to a review of public records. For instance, the Los Angeles International Church (LAICC), the largest ICOC church by membership, was incorporated in California in December 1990, according to corporate records with the California Secretary of State. The Los Angeles International Church (LAICC) described its structure on its website, noting that it's "organized into eight self-supported regions. Each regional evangelist has been given the charge of equipping the brothers and sisters in his part of the LA church (region) to effectively evangelize his area with the saving message of Jesus Christ as well as helping one another mature in Christ." Notably, "each region has a regional financial advisory group that assists the ministry staff and the Board of Directors with the oversight of the finances in their particular region."

[5] During the COVID-19 pandemic, branches of ICOC received 77 Paycheck Protection Program (PPP) loans, totaling over $9.4 million. Over $9.2 million of those loans were forgiven, including accrued interest. (projects.propublica.org, accessed December 15, 2022; disciplestoday.org, accessed December 15, 2022)

these "recurring sins" were never investigated by ICOC.[6] Defendants, McKean and other church leaders were acutely aware of Chuck's disturbing pattern of abuse, but nevertheless actively concealed Chuck's misdeeds to avert discovery by the police.

38.     Chuck died in August 2018, however, Plaintiffs and scores of members witnessed his ongoing abuse of children and adults within the congregation through the end of his despicable life.

39.     Sam Laing, one of Chuck's continued faithful supporters and a prominent lead evangelist with ICOC, was aware of Chuck's deeply disturbing abuses and its chronology. Sam Laing recently made a statement about Chuck in a 2018 article published in "Disciples Today," which is an ICOC owned platform/news source:

> **"Chuck Lucas was a man of deep conviction. He was a disciple of great courage and perseverance. He was criticized, persecuted and attacked for what he stood for, but he never quit. Yes, he had his weaknesses and failures along the way, but he, by grace, repented and overcame them, and was restored."[7]**

## McKEAN FORMED ICC, A CARBON COPY OF ICOC, TO CONTINUE THE SAVAGE ABUSE ENTERPRISE

40.     In or about 2003, McKean formally split from ICOC after an uprising and various op ed public letters were published by ICOC leaders. He officially formed ICC in or about 2006. ICC encompassed the same guiding principles and culture as ICOC. **ICC was a carbon copy of ICOC, however, ICC eventually eclipsed ICOC in terms of the mania, secrecy and abuse that occurred within its churches**.

41.     From its inception, ICC improved upon ICOC's tools of mass manipulation and exploitation, which aligned with McKean's vow to learn from any past incidents of dissent or divisiveness and ensure that challenges to his authority never

---

[6] History Repeats Itself: The Rise and Fall of Kip McKean & Chuck Lucas.  Ryan Britt. 2002. Accessed on December 29, 2022 at http://www.reveal.org/library/history/britt2.html

[7] Chuck Lucas: A Servant of God. Sam Laing. 2018. Accessed on December 29, 2022. https://www.dtodayarchive2.org/chuck-lucas-gods-servant-and-how-he-used-him

occurred in his new "movement of God".

42.    McKean currently oversees all ICC operations from its Los Angeles headquarters and he has completely separated himself from ICOC because he believes the entire ICOC congregation is lost, likely because he is no longer the leader. ICC's current membership is believed to include approximately 7,000 individuals.

43.    A former leader of ICC, Coltin Rohn, oversaw the Columbus, Ohio ICC congregation and was **fired for publicly voicing concerns surrounding McKean and other ICC leaders' financial abuse, coercion, and control**. Coltin was a full-time evangelist with ICC but was immediately fired for criticizing the church's tactic of bullying members to give a specific amount of money to the church. Coltin was deeply concerned about the church's practice of threatening a members' salvation and standing within the community if they did not give 10-40% of their annual income to the church.[8]

44.    On or about December 24, 2022, Coltin became aware of an ICC letter, sent out to every ICC member showing the process of "marking" Coltin and his wife. Defendants have continued to threaten anyone who speaks out against the church with vexatious legal actions, disfellowship, and/or "marking."

## THE "DISCIPLING" STRUCTURE IS THE FOUNDATION OF DEFENDANTS' DEPLORABLE CAMPAIGN OF MANIPULATION, PSYCHOLOGICAL AND SEXUAL ABUSE OF CHILDREN

45.    ICOC was born from a "discipling" movement that arose among the Churches of Christ during the 1970's and the church has maintained this practice in present times. This is a strict practice involving a "discipleship hierarchy" where a formal **discipleship tree or a top-down authoritarian hierarchy** was formed.

46.    Church leadership assigns a specific and strategic discipleship partner to oversee and guide the other member. The "disciplining" movement was memorialized by Flavlil R Yeakley Jr. in a book titled "The Discipling Dilemma". The **rigid and**

---

[8] The New York Daily News stated that "dozens" of former members of ICOC "call it a destructive sect that is more concerned with drawing in new members and draining their money than in matters of faith." **One ex-member of ICOC described ICOC as a "pyramid scheme" in which members "were all giving 10% to 40% of our income."**

**pervasive culture of fear, coercion, control, manipulation, judgment, exclusion, punishment**, along with the church's overt focus on membership growth (i.e., its primary source of income), have resulted in a **widely accepted categorization of ICOC and ICC as toxic, destructive cults**.

47.    Any member's position, health, and wellbeing depend heavily upon success in expanding the congregational rosters. Defendants' leadership created a self-perpetuating business model to attract new recruits/members, and in doing so, generate hundreds of millions of dollars in revenue for the church.

48.    An illustration of the Defendants' hierarchical model of authority is depicted below:

The ICC had a complex and highly hierarchical organizational structure, unusually so for a relatively new and small religious group. There are many layers of leadership, similar to a pyramid or the Roman Catholic Church.



The ICC has a pyramid-shaped, hierarchical structure of authority. At the top was Kip McKean, the *World Missions Evangelist*, and his wife Elena Garcia-McKean, who served as *Women's Ministry Leader* for the group as a whole. As of November of 2002, the Mckeans

49.    In addition to functioning as a life coach to other members, the "discipler" members also acted as de facto therapists. The disciplers would frequently instruct members to conduct themselves in a certain manner and if the member did not heed to

the instructions, they were rebuked or labeled as "disobedient" or "arrogant" until they were eventually "broken" by their sins.

50.    The discipler structure has facilitated Defendants' systemic concealment of abuse and allowed predators to abuse women and children with impunity. For example, on July 1, 2018, Damon and Vicki James, ICC "disciplers" working at the specific direction of McKean instructed a member to refrain from reporting two years of abuse physical and sexual by her husband. Damon James scolded this survivor and stated, "[w]e don't do that to our brothers as disciples."

51.    Vicki James then victim shamed the woman by stating "[w[]hy would you have the heart to press charges?" Damon continued and told the woman, "[w]hat does that gain? That puts you in front of 'the world'." This situation resulted in the woman eventually defecting from ICC and she is trying her best to recover from the years of abuse she endured by her husband and ICC.

52.    The following is a harrowing statement by Carter Whitten regarding the abuse he endured in connection with his "discipler" experience:

> "For reasons I still don't fully understand, my 'discipler' met with me and two other teen boys at one of the boys' houses. In the basement we sat in a circle, and the goal of my discipler was to break me down and to get me to fully understand the horrors of Hell: Meaning what I had to look forward to if I didn't enter the Kingdom (the ICOC) before I died. So next he took it upon himself to paint a vivid picture for me: My discipler described a scene in hell in which I was nailed to a ceiling by my PENIS and spun around by a demon. Hanging only by my genitals, I was forced to watch the devil RAPE my mother repeatedly for all eternity. I was then asked to take that grotesque vignette and multiply its terror by 10,000 (or some other arbitrarily large number) to catch even a glimpse of how utterly horrifying the future awaiting me was, unless I was to get baptized and be saved. I finally broke down and cried. Which was clearly the goal, as the ICOC famously conducted what they called "breaking sessions."

In addition to completing their entire conversion series of Bible studies, there were even more hurdles I was told I had to clear in order to become a baptized disciple. One is that I had to call the fathers of all the girls in the teen ministry to whom I was sexually attracted, confess my sins of lust after their daughters, and ask for the fathers' forgiveness. I was mortified. I then asked another teen boy—a good friend of mine, if he had been made to do the same thing before he got baptized. He revealed he had indeed been told to do so, and was terrified by the whole ordeal and shunned by most of those fathers.

The final step was the sin letter or sin list. All disciples-in-training (those studying the Bible) were expected to write an exhaustive letter to God, documenting every single sin they had ever committed in their entire lives and asking for forgiveness. The letter was usually meant to be read aloud in a group setting. I was only 14.

I must have been twelve or thirteen when I realized that almost every conversation or sermon in the teen ministry was talking about lust and masturbation and sexual sin on some level. So now looking back as an adult, I am horrified by how perverse and abusive this culture was. Like many evangelical denominations, the ICOC indulged in purity culture and thus placed a heavy emphasis on sexual purity.

But the ICOC took it to a whole new level, the way that adults dealt with teens in these ministries—children that were not their children—Seems criminal to me. At the very least, it was a gross and egregious abuse of the power dynamic between adults and children. And I know enough people across the country in the ICOC to know that this was not an isolated incident, it was literally happening in every 'teen ministry.'

But even worse than this, I had a friend that was physically assaulted while he was studying the Bible, because he tried to get up and leave. So the teen leader held him down and beat him up.

We had to meet in one-on-one and group D-times, where we had to confess our sins (especially sexual sins) in a group setting, and the disciplers (teen leaders) would sometimes confess sins as well. During one such meeting, an adult discipler confessed to a group of four or five boys that he had had a wet dream (nocturnal emission) that week, and in many other meetings we were told by disciplers that masturbation equated to "ejaculating on the cross." I never understood why grown men were spending so much time with boys as young as 12 and 13 confessing all their sexual sins to them… I heard things I had never heard before, and it all felt very abusive and inappropriate to me, even as a child.

Why were grown adults grilling other people's teenagers for specific sexual details… When most of these teens had never even had a sexual experience in their life. The abuse of power here and power dynamics were so damaging to most of these teens in the teen ministry, that the PTSD and anxiety and therapy that most of these children have needed their whole lives is astounding."

## CHURCH LEADERS WERE OBSESSED WITH FINANCIALLY EXPLOITING ITS MEMBERS

53.     McKean, along with other ICOC leaders were obsessed with growing church membership and, therefore, **imposed recruiting quotas on members**. All members were required to attempt to recruit a certain number of new members each day and members were also required to bring visitors to all church events. ICOC imposed quotas for everything imaginable. **Members were isolated from outsiders and the church cultivated an atmosphere that promoted and concealed the systemic abuse of women and children within the church**. Members were together every day, and they were not allowed much, if any, contact with family members or friends who were not church members. Of course, the only exception to this strict rule is that members could contact outsiders for the sole purpose of recruitment.

54.     Defendants' members were forced to tithe and give 10-30% of their gross income to the church *and* participate in special contributions for missions approximately twice a year equaling approximately **40 times their normal tithe amount**. ICOC was relentless in its pursuit for funding and church leadership would resort to **interrogating members about their income**, going so far as to **demand copies of the members' paystubs**. For example, if a member gave $4,000 per month, the total mission contributions for that year would equal an additional (40x) and the total required sum would be $160,000 in addition to the normal yearly tithe amount of $48,000. This member would be required to give the church a whopping total of $208,000 for the year!

55.     If the tithing budget was not satisfied, leaders or "disciplers" were forced to contribute the financial shortfall themselves, or members were required to **locate the offending member who failed to tithe and sit on their porch until they arrived home to obtain their tithe funds before Sunday evening was over**. The pressure to comply with the church's rigid demands was a source of anxiety and depression for many members. So much so that **several ex-members committed suicide**.

56.     In 2005, two former ICOC members filed a suit in Tennessee "claiming the church uses cultlike tactics, manipulation, peer pressure and guilt to force members into tithing and making other financial contributions." They alleged that for personal gain, "the Nashville Church, the [ICOC], Hope Worldwide, and Central and South America World Sector jointly participated in a scheme to defraud church members, who are not allowed to inspect the church's financial records."

57.     A former member named Tina witnessed Non-Disclosure Agreements being forced upon parishioners, claiming that they could never talk about the true finances of the Defendants despite evidence that ICOC opened offshore accounts

1    containing massive quantities of cash.[9]

2         58.    Moreover, McKean actively solicited church members to turn over their

3    COVID-19 relief money to the church. The following are excerpts of emails from

4    McKean to vario

> I would like to address the USA Churches, but I want all of the International Churches to realize "our" unprecedented situation and unprecedented opportunity. Recently, the USA Congress passed a 2 Trillion USD Stimulus Package. Already this week, many Americans received their $1,200 stimulus checks from the government. The World Sector Leaders knew this was coming, so we laid out a plan for every USA Church to help make Missions: 40% of the membership will give all of their stimulus checks; 40% give half; 20% raise their missions contribution pledge some other way. Prayerfully, many churches will exceed these goals!

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   _____

26   [9] Top leaders of the ICOC put "different ICOC assets and properties in their names" to shelter and hide those assets "so that the church didn't specifically own them." For example, The Bay Area Christian Church listed its address at the

27   location of the HOPE Technology School for Autistic Children, which was owned by Bay Area Christian Church executive minister Russ Ewell. As of 2022, the property had a total assessed value of $7.7 million, all of which was exempt from taxes under another exemption. The Bay Area Christian Church also received a PPP loan of $764,600 in

28   April 2020.

**Here are my charges for the USA Churches:**

1. Call your members to give their stimulus checks ASAP. Americans are known to spend everything in their accounts. The great Chicago Church has called these $1,200 checks "Manna from Heaven!"

Presently, all around the world, if a member misses 2 or 3 weeks – usually recognized by missing 2 or 3 weeks of weekly contribution – this is a red flag that they may have become unfaithful. (There of course are always exceptions.) It is a fact that almost every USA Disciple has the ability to give online. So discipling in the COVID-19 Era must include how to give one's weekly contribution online.

Therefore, in the COVID-19 Era to show more forbearance and grace, if a person on your membership has not given for 4 straight weeks – remember this is the USA Churches not third world like India, the Philippines, Africa and some nations of Central and South America – then we must have the conviction that they have become unfaithful to God. At this point, after consulting your World Sector Leader then a decision needs to be made concerning the removal of their name from your membership. However, before that is done, the Evangelist or Women's Ministry Leader must contact them to see if there are extenuating circumstances. Take each situation on a case by case basis.

## ICOC AND ICC MEMBERS WERE SYSTEMATICALLY BRAINWASHED AND MANIPULATED INTO SILENCE

59.    Initially, early recruits received profound amounts of "love bombing" to lure them into a false sense of security, thereby allowing sexual predators to successfully manipulate them and eventually abuse them with the comfort of knowing these vulnerable and newly brainwashed people would never report the abuse.

60.    Each member is trained to understand, which they come to wholeheartedly believe that in connection with the church, **"compliance was the path of least resistance."** Members sincerely believed they needed to follow the Bible verbatim and **Defendants, including their leadership, were the only "true" modern-day disciples on Earth**.

61.    Church members were a dynamic and diverse group, consisting of scores of successful individuals such as doctors, lawyers, professional athletes, actors, teachers, business owners, PhDs, and **a remarkable number of leaders possessed psychology degrees**.

62.     It is without doubt that their education and training enabled these members to psychologically deplete members and manipulate children and their parents into submission, which created fertile ground for heinous sexual and physical abuse to thrive.

63.     One psychologist ICOC member currently owns a school for autistic children in the San Francisco area and he has been accused of multiple instances of sexual abuse of adults and children/teenagers while he was in Boston. ICOC and McKean were aware of this despicable man's repeated abuse, but **McKean orchestrated his relocation from Boston to San Francisco to conceal his predatory practices and avert criminal prosecution**.

64.     McKean's carefully crafted church hierarchy lent itself to maintaining secrecy and preventing outside intervention. The following is a rough depiction of the church's organizational structure:



65.     Defendants' structure was purposefully organized in this manner to **ensure the abuse within the church remained a secret to all outsiders**, including the authorities. Indeed, someone within the church was always monitoring lower ranking members and giving them explicit instructions on how to conduct themselves.

66.     Questioning higher ranking members or the church in any manner was frowned upon. Some individuals were "disfellowshipped" or "marked" for being divisive if they asked too many questions or questioned any leaders. A member with either of these labels was **fiercely ostracized by the entire membership, including their families**. "Disfellowshipped" members are essentially excommunicated and shunned from Defendants' communities. Accordingly, being labeled as "disfellowshipped" or "marked" equated to hell on earth and in the afterlife for any member so labeled.

67.     In furtherance of the Abuse Enterprise, the pyramid hierarchy also paved the way for leadership to require that **all ICOC and ICC members receive mental health services (i.e., therapy) *exclusively* from church therapist members**. The therapist members were biased in favor of the church and tailored their treatment and "findings" based on guidance and instruction from McKean and other leaders within ICOC and ICC. These therapist members' strong bias is best evidenced by the fact that a single instance of abuse was never reported to the police. In fact, these therapist members routinely instructed victims to refrain from reporting the abuse to the police, along with instructions to "forgive" the abuser for their heinous transgressions.

## **DEFENDANTS CREATED A SICKENING CONVERSION THERAPY MINISTRY TO FACILIATE THE BRAINWASHING SCHEME THAT MANIPULATED ADULTS AND CHILDREN INTO SILENCE**

68.     ICOC implemented a LGBTQ+ conversion therapy ministry called **Strength in Weakness spearheaded by Guy Hammond**. Strength in Weakness offers/offered its members three options: live the remainder of their lives celibate; partner with someone of the opposite sex; or continue living their homosexual life of sin and spend their afterlife in eternal damnation. Although "conversion therapy" is banned in several states, **ICOC used this ministry for conversion therapy under the pretext of a support system**. ICOC has held at least 20 Strength in Weakness "conversion therapy" seminars in states where conversion therapy is banned.

69.     The mere existence of Strength in Weakness is nothing short of ironic, as it became **common knowledge within the churches that Chuck Lucas had**

**numerous homosexual relationships with young men in the church**. In a 2022 podcast with Steve Johnson, ICOC evangelist James Lloyd stated:

> "The truth is that the foundational "original sin" of our movement was homosexual sin. Man on man, specifically a male older leader, on young interns. And not just a few times—you can find out, it's not like nobody knows. The fact that our original sin was a senior leader (Lucas) who is respected and loved and training a group of young men—As the leader gets them in a room and shuts the door and this leader (Lucas) 'puts the moves' on these young men. And it's worse than it sounds because those men then became ministers (perpetrators) and went out into their churches and did the same things to others— and I know that personally, because I was in some of those meetings where it was confessed.
>
> They thought it was best not to share this with anybody, and I bought into those reasons. They would say things like, 'He's got children, he's got a wife, you can't just say those things out loud, it could hurt the faith of a young Christian.'
>
> All these things are just the hierarchy and patriarchy saying that we don't need to bring this thing up about 'man on man.' And I don't personally think that this sin is any different than if it was between a man and a woman by the way— I'm only calling it sin because they weren't married.
>
> But the real sin here is that we (church) hid it. People should be taught that this is how our group started. And some of that (sin) has continued for three generations. Some of that trauma was carried on, was passed on to other men as they went out into other (ICOC) churches."

/ / /

/ / /

/ / /

## DEFENDANTS SHAMELESSLY PREYED UPON AND DEFRAUDED COLLEGE STUDENTS

70.     Defendants have increasingly focused on **recruiting college students**. By utilizing college campuses across the globe as its primary hunting grounds, they are more successful at grooming new members but have an opportunity at pecuniary gain by convincing them to pay for a worthless education. On information and belief, ICOC operates a campus ministry at Pepperdine University under the name "Alpha Omega" to conceal its connection to ICOC.

71.     The practice of preying upon college students resulted in numerous televised exposés in the mid-1990's when the ICOC cult commanded larger numbers, including but not limited to: 20/20 with Barbara Walters, Inside Edition, Fox News, BBC, and MTV.

72.     These news stories were explosive and highly negative representations of the church, as many parents were crying out to the media for help because their college aged children were being brainwashed by a cult. Some parents expressed that they felt like their children were kidnapped by ICOC.

73.     Indeed, ICOC and ICC's exploitation of college students ultimately resulted in the ICOC\ICC being **banned from on-campus recruiting from several schools across the nation**, including but not limited to Boston University, which is situated near the epicenter of the ICOC. Surprisingly, the exposés did not garner enough outrage among the general population, leaving the ICOC\ICC to continue to prey upon college students without repercussion. Until now, the ICOC has had the luxury of the benefits from their long-time obfuscation of their parasitic internal practices.

74.     Mr. McKean is so brazen that he **publicly admitted to defrauding students** by handing out unearned, illegitimate, and meritless doctoral degrees designed to both inflate the importance of its senior members and extract unearned pecuniary gains.

> "The ICC runs an unaccredited college, called the International College of Christian Ministries, or ICCM,

where they are handing out doctorates to anyone they choose, where the established course work is limited only to literature/books created within the ICC. This is why most leaders in the ICC put the abbreviation of "Dr" in front of their names, because they have been giving each other unaccredited doctorate status. The ICCM has already brought in approximately $6 million through ICC members attending this unaccredited college."

*"During Covid, while the (financial) giving inside most religious organizations declined, our giving inside of God's Sold-Out Modern-Day Movement steadily increased! Due to our disciples receiving $3000 each in stimulus checks, and approximately $6000 total per couple, these members turned over that stimulus money to the church. As a matter of fact, the sold-out ICC Disciples are now giving $250K every single WEEK!"[10]*

*"In addition to this money, and according to God's promise of always taking care of his people, the Sold-Out movement was further blessed by the government providing SBA loans to our members. Therefore, we were able to bring in $1.2 million of SBA loans to God's sold-out movement. We in turn used this SBA loan money to start 22 churches around the world. Isn't that incredible!! To God be the glory!"*

## DEFENDANTS ACTIVELY CONCEALED ABUSE, INCLUDING THE FORCIBLE RAPE OF A 3-YEAR-OLD GIRL

75.   The active concealment of systemic abuse within the churches by a **den of "religious" sexual predators** was the impetus of a devious and rampant culture of psychological abuse and manipulation, willfully ignoring the pervasive sexual abuse of children and adults throughout the churches and actively concealing abuse from the authorities.

76.   In furtherance of efforts to protect the church and its primary source of revenue (its members) at all costs, Defendants attempted to cover up these disgraceful crimes by manipulating members with remarks from McKean such as:

---

[10] Currently, the sold-out ICC Disciples are now giving approximately $360K per week.

*"We cannot report these abuses, because it would hurt our church, which is God's Modern-Day Movement."*
*"Do you want the fall of God's modern-day movement on your head???!!"*
*"The cause of protecting God's Kingdom on earth is more important than the sin or the pain of a few individuals."*
*"We need to forgive our brothers who sin and realize that they are a new creation in Christ, and give them a chance to make things right. If we report them, it will destroy their lives and hurt the church."*

77.    In addition, the church engaged in strategic victim blaming and victim shaming. For example, **young children who were abused were later blamed for that abuse when the ICOC would assert how their clothing was "too provocative"**.

78.    One former member of the East Region Los Angeles ICOC was pressured and ultimately convinced to refrain from reporting her 3-year-old daughter's abuse. She was told that if she reported the abuse, it could "ruin everything" and bankrupt the church. **McKean himself contacted this woman and personally thanked her for her "loyalty" and for not reporting the abuse to the police**. He congratulated her on her strength and courage to endure the situation with such faith.

79.    An ICOC affiliate, formerly known as AMC Ministry of the Los Angeles ICOC, and currently known as **Turning Point Church has similarly facilitated and concealed abuse**. Recently, Turning Point Church claimed publicly that no sexual abuse has occurred in their church, however, there are at least three survivors that reported abuse to staff members who took no action with the reported abuse and never alerted the congregation to the existence of sexual predators, some of whom worked in Kids Kingdom (children's ministry).

80.    Turning Point Church's leadership that ignored reports of abuse include the following: Kevin and Tracena Holland, Mike and Kim Upton and Jay and Traci Minor. In addition to the foregoing, Turning Point Church uses a licensed "Marriage & Family" counselor named David Bruce, who is a mandated reporter. Mr. Bruce,

notwithstanding his knowledge of abuse, refused to report several instances of abuse and helped conceal the abuse for the Defendants' benefit.

81.    One former member of the Los Angeles ICOC and the Turning Point Church, Sandi Derby, Advanced Grief Recovery Specialist, Trainer for The Grief Recovery Institute and Ordained Minister, has "firsthand knowledge that allegations of sexual, physical, and psychological abuse of teens and adults were brought to leaders in Turning Point in 2019 for abuses that occurred in the early 2000s." This former member witnessed leadership's failure to support the abuse survivors and their failure to report the abuse to the police. As a result of her open support for the survivors, this former member was discredited within the church, which eventually led to her defection.

82.    The Hampton Roads ICOC location in Virginia has also received reports of abuse and done nothing in response. Specifically, Ed and Dr. Deb Anton were informed of the sexual abuse of a teen ministry member and refused to report the abuse or alert the congregation to the existence of a sexual predator within the church.

## DEFENDANTS' DOCTOR MEMBERS ILLEGALLY MEDICATED YOUNG CHILDREN IN FURTHERANCE OF THE ABUSE ENTERPRISE

83.    Defendants' abuse went far beyond physical, psychological, and financial exploitation. Many children, such as Anthony Stowers, were administered medication by church affiliated "doctors". Often, the affiliate doctors such as Dr. Kris Stowers (Anthony's uncle) would administer medications that were prescribed for other conditions or children received medication for conditions for which they were never diagnosed. To conceal their illegal conduct and minimize scrutiny, **Defendants' doctors provided the children with medication in unmarked or mismarked bottles**.

84.    One of these affiliate physicians is a staff doctor at Florida State University and another that has **administered medications to children for mental illness despite lacking any qualification to do so medically or through public license**. On information and belief, this physician is an orthopedic surgeon for athletes.

85.   **Medicating children has also facilitated the ICOC's clandestine efforts to conceal the ongoing child abuse from anyone outside the church**. The children were persuaded to believe, through strategic pharmacological deception and psychological manipulation, that they were never abused and if their own memories seem contradictory, then their memories were faulty.

## DEFENDANTS LEVERAGED CHILDREN'S MINISTRIES TO EFFECTUATE THE ABUSE ENTERPRISE

86.   The children's ministry was named the **"Kids Kingdom", which served as a demented playground for the multitude of sexual predators within Defendants' churches**. Countless instances of abuse happened within the Kids Kingdom, as the program hosted mission trips (HOPE Worldwide), social events and the children frequently visited members' homes.

87.   Defendant HOPE Worldwide is ICOC's benevolent arm wherein teenagers took mission trips around the world to spread God's Word. Many of these children who were participating in what they believed to be an evangelical trip, were ultimately sexually abused by vile adult men. Children and/or their parents reported the sexual abuse, including rape, to elders and doctors (i.e., mandated reporters) within the church, however, the church never bothered notifying the police of the illegal activity. **There were no instances of any ICOC medical doctors reporting the abuse to anyone, let alone anyone outside the church**.

## DEFENDANTS PROMOTED THE DEPLORABLE PHYSICAL ABUSE OF CHILDREN UNDER THE GUISE OF "DISCIPLINE"

88.   In addition to sexual abuse, ICOC and ICC children were routinely physically abused under the pretext of "discipline". Church leadership often recited the following commonly known passage from Proverbs 13:24 as justification for child abuse: "Those who spare the rod of discipline hate their children. Those who love their children care enough to discipline them."

///

89.    For example, members were instructed to **spank children, including infants, with a wooden paddle, custom made with a heart shaped hole in it, to create a more aerodynamic and effective (painful) spanking device**. A true and correct image of the heart shaped paddle is depicted below:



90.    Members were instructed, with visuals, how to **use corporal punishment without leaving bruises, welts or red marks, so the offending members could not be reported to child protective services**. One former member recalls frequently seeing young children at church with welts or bruises on their thighs. On one occasion, this member witnessed a child with a "heart shaped welt" on his/her body.

### 1,200,000 PEOPLE DEFECTED FROM ICOC AND ICC AFTER GROTESQUE ABUSES WERE EXPOSED

91.    Since at least 1979, ICOC and ICC have averted authority suspicion

notwithstanding the fact that in excess of the last 40 years, **predatory members have escaped prosecution for countless instances of sexual abuse (children and adults), physical abuse (adults and children), spousal abuse, and emotional abuse**.

92.     From its inception in 1979 to the present, approximately **1,200,000 souls defected from ICOC**. The large number of defectors is due, in large part, to the explosive growth that ICOC experienced.

93.     For three consecutive years, the ICOC was labeled in the religious world as the **fastest growing church on the planet**. Simply put, ICOC's growth was nothing short of profound. On the other hand, its bleeding was also profound, because members defected in record numbers as they became increasingly aware of the heinous, pervasive abuse of children and adults and the corresponding cover ups. These courageous souls would simply disappear, never again to be seen by anyone in the church.

94.     According to some of the most respected cult experts around the world, including but not limited to Dr. Steve Hassan PhD, Defendants are some of the most dangerous cults in existence. This is primarily because of the church's insidious tactic of masquerading as the Christian church next-door with a deeply rooted Biblical foundation. On its face, this public image of the church seems innocent and believable, however, **the church's internal machinations are characterized by unmitigated systemic and chronic physical and sexual abuse of children and adults of both genders within the church**.

95.     Defectors have since revealed the abuse they suffered and/or witnessed at ICOC and ICC. Former member Lisa Johnson who as a top leader in New York City and a friend of McKean, in a podcast called "Eavesdropping" made the following comments regarding the church, based on her personal experience. This is a quote by Lisa Johnson from a recent episode of their podcast called "Eavesdropping."

> *"Women (in the ICOC) are getting ground up, and I mean*
> *tons of people, it's not an isolated case here and*

*there….And I think about these women now, after all these years…*

*So I'm gonna bring up something here…*

*…The sexual abuse….there has been sexual abuse, there has been emotional abuse, and there has been some physical abuse of women… and part of that is the issue of patriarchy. We developed a system and a way that was not safe for women….There are women that have been very damaged and ground up by that.*

*The fruit of this is so obvious, how can you miss it?! How many women have been told to stay with their physically abusive husbands and how many women have been sexually abused?!"*

## DEFENDANTS AUDACIOUSLY AND REPEATEDLY REFUSED TO REPORT PEDOPHILES WHO WERE LATER ARRESTED AND PROSECUTED

96.    Several pedophiles have been arrested in connection with various abuses. These individuals committed numerous crimes before the police intervened and are a miniscule representation of the true number of predators who have operated with impunity within the church since 1979.

97.    In January 2012, David Iburg, aka David Saracino ("David" or "David Saracino") was sentenced to 40 years of hard labor in the State of Louisiana, the maximum sentence, for **forcible rape upon a 4-year-old girl in 2004**.[11] The prosecutor, Cynthia Guillory, told the judge that he was among the worst of the worst. Mr. Saracino purposefully sought out women who were vulnerable and struggling financially so he could gain access to and victimize their young children. Mr. Saracino faced charges and convictions in Texas, Utah and Louisiana, where he received the 40-

---

[11] *State v. Iburg*, 12-2720 (La. 5/17/13), 118 So.3d 372

COMPLAINT

year sentence.

98.    Mr. Saracino attended the East Region of the LA ICOC, where several members (single mothers) of the ICOC reported to the leaders in the East Region in or about 1998 that David Saracino had continuously molested their daughters. Ultimately, several police reports were filed by the parents, while the ICOC remained silent. Just as the ICOC did nothing to address these reports while David escaped to the San Diego ICOC and freely resided in the Escondido area temporarily Like so many others, these mothers were told not to share with anyone else what David had done, as it would "hurt the church."

99.    David ultimately disappeared uncaptured. David was free to go on a nationwide crime spree, abusing and raping little girls along the way. David was finally caught, but only an episode of America's Most Wanted produced credible leads that resulted in his capture. Had ICOC assisted in his arrest or alerted their congregations, David Saracino could not have continued abusing children with reckless abandon. ICOC's commitment to abject apathy is sickening and clearly intentional.

100.    Since December 31, 2022, at least four of David's previously unknown victims from the East Region Los Angeles ICOC have come forward regarding the abuse they endured, and it is believed there are scores of additional victims who are either too entrenched in the church or too scared to tell their stories.

101.    In or about February 2018, a volunteer soccer coach named Waldo Milla-Guerra of Middlesex County, New Jersey was arrested on charges of possession and distribution of child pornography. Mr. Milla-Guerra volunteered at the South Brunswick Soccer Club and formerly taught at Kid's Kingdom at Central Jersey Church of Christ in North Brunswick.

102.    In 2005, Benjamin Samuel Speights, a member of the south region of the LA ICOC, was convicted for lewd and lascivious acts against a child under the age of 15. Mr. Speights' unlawful conduct included forceable participation of a 14-year-old girl to create pornographic videos that he sold.

103.   In December 2020 Mr. Speights was convicted in Arizona in connection with a Class 2 felony of sexual exploitation of a minor as part of a negotiated plea deal related to child pornography charges. Mr. Speights was a leader in the "Kid's Kingdom" ministry in the El Segundo South Region of the Los Angeles ICOC. Several children at this ministry reported his physical abuse. Without a doubt, Mr. Speights has a sordid and despicable history of abusing children. Consistent with their historic complicity, Defendants never reported the abuse these children endured or attempted to prevent future abuses.

104.   Nicholas Griffin Lombardi ("Mr. Lombardi") is another example of a known pedophile abusing children within Defendants' churches. He was a long-standing member of the ICOC, as were his parents. On or about November 27, 2022, as a clear demonstration of kind of monster Mr. Lombardi truly is, Mr. Lombardi posted on his personal Facebook page "I kind of have a fantasy of fucking a child ha[.]"

105.   Mr. Lombardi was convicted for lewd and lascivious acts against a child under the age 15. In addition, there are numerous accusations of abuse against Mr. Lombardi, however, Defendants refused to report his abusive conduct to the authorities, and he remains free to continue abusing children with impunity.

106.   In approximately August 2011, one ICOC abuser, William (Bill) Thomas McLaughlin, was sentenced to 6 years to life, followed by 10 years to life of parole for various counts of felony sexual assault on a child by a person in a position of trust.[12] He abused approximately 10-15 individuals, all of whom were expelled or in some fashion pushed out of the Denver ICOC as punishment for failing to comply with the leaders' commands.

107.   Tomotaka ("Tom") Andrews Wilton of the Portland, Oregon ICC location raped a child[13] for years and church leaders, including McKean, were acutely aware of

---

[12] https://castlerocknewspress.net/stories/denver-man-sentenced-in-douglas-county-for-sex-assault-on-child,117951

[13] http://www.isp.idaho.gov/sor_id/SOR?id=35071&sz=1360; https://www.homefacts.com/offender-detail/IDSX35071/Tomotaka-Andrews-Wilton.html

-33-

COMPLAINT

1   the abuse but did nothing to warn anyone regarding this despicable predator's presence.

2   He was convicted in Idaho in 2009 of two counts of third-degree rape of a child and is

3   now a registered sex offender. On information and belief, Mr. Wilton remains a

4   member of the Portland ICC and is free to abuse other children.

### Tomotaka Andrews Wilton Registration Details

Last Known Address: 2509 W BOISE AVE
BOISE, ID 83706-2920
ADA COUNTY, ID



DOB:      1971-11-04

Race:
Asian Or Pacific
Islander

Sex:      Male

Eyes:     Brown

Height:   5 ft 3 in

Hair:     Brown

Weight:   173 lbs.

**Tomotaka Andrews Wilton - Registered Sex Offender**

VIEW CRIMINAL RECORD

### Offense or Statute

Offense/Statute:   Rcw 9a 44 079 Rape Of A Child In The Third Degree
Charge Correlation Pending
Date:              17 March 2009

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT

108.   The active concealment and protection of known pedophiles was pervasive particularly in the Texas ICOC churches, which is consistent with an ethos that in Texas, "we don't call 911". Indeed, this slogan is branded on apparel and other retail items such as the following t-shirt and snow globe:

 

109.   There are at least 4 known pedophiles who were allowed to run rampant within the churches without any notification to the congregation that their children were in danger.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1          110.   Karim Torres was convicted of indecency with a child by contact and on

2   information and belief, he is currently a Bible talk leader and he has served several

3   Texas ICOC locations. He and his wife are known to frequently visit other ICOC

4   churches as speakers at family retreats.

Offense: INDECENCY WITH A CHILD BY CONTACT

| Statute | TEXAS PENAL CODE 21.11(a)(1) |
| --- | --- |
| Victim Sex | Female |
| Victim Age | 16 |
| Disposition Date | 07/19/1999 |
| JUDGMENT | 3YPROBATION/COMMUNITY SUPERVISION |



Photo Reported - 04/10/2006



Photo Reported - 01/08/2001

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

111.   Warren Inman was convicted of at least three counts of indecency with a child in or about February 2021 in Denton County, Texas, Case No. F-2012-0728-D. He was a member of the Dallas ICOC and lives in Denton County. He was a worship leader and allowed college students to live in his home, as he regularly had college worship group meetings at his home. Mr. Inman has been in and out of prison and was finally arrested for child molestation. On information and belief, he was *not* reported to the police by ICOC.



/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

112.   Joseph Ursini has multiple arrests and has been in and out of the ICOC fellowship over the years. On information and belief, none of the Texas ICOC churches, including the Dallas location, have reported Mr. Ursini's criminal conduct to the relevant authorities.



**Ursini**, **Joseph** Mugshot | 2022-02-12 16:20:00 Dallas County, Texas Arrest

Booking Details name URSINI, JOSEPH dob 1980-09-30 age 41 years old race White sex Male booked 2022-02-12 Charges Information about charges is not available yet

113.   Luis Miguel Quiroz was the subject of several individuals' reports to ICOC regarding extreme sexual abuse of several minors. However, the church did nothing and he was finally arrested approximately 10 years after the reports were made to the church. Luis is the brother of Dr. Carlos Quiroz, an ICOC pediatrician.



Home » Texas Mugshots » Fort Bend County Mugshots » Quiroz,luis Miguel Mugshot | 2017-07-05 20:26:00 Fort Bend County, Texas Arrest

| QUIROZ LUIS MIGUEL

ON 2017-07-05 20:26:00        FORT BEND COUNTY, TX MUGSHOTS

## SPECIFIC ALLEGATIONS

### The 17-Year Abuse and Torture of Jane Roe 1

114.   Jane Roe 1 was born in 1984 and she is the younger sister of Jane Roe 2. Jane Roe 1 was **diagnosed as an infant with cystic fibrosis and she spent much of her childhood in and out of hospitals, sickly, frail and constantly worried that she would die at an early age**. Notwithstanding her fragile physical state, she was repeatedly abused and tortured by the entire Wilkinson family for approximately 17 years, including Mark and Cindy, and two of their children Nancy and Marty Wilkinson. Mark, Cindy, Nancy and Marty Wilkinson are collectively referred to as the "Wilkinson Family".

115.   The Wilkinson Family attended the same ICOC church as Plaintiffs and as a result, the Wilkinson Family engaged in a systemic, deceptive and strategic cover-up orchestrated by Mark and Cindy Wilkinson, Mike Taliaferro, and other church leaders that ensured Jane Roe 1 would not report the abuse to the authorities.

116.   Jane Roe 1's first memory of abuse occurred when she was 3 years old when she was abused by Nancy Wilkinson at Nancy's parents' home (the "plantation house"). Over a period of 17 years, Plaintiffs spent several days a week with the Wilkinson Family at ICOC sanctioned events and not a single ICOC leader or church member reported Plaintiffs' horrific abuse.

117.   In this first memory of abuse, Nancy Wilkinson, who is approximately 7 years older than Jane Roe 1, forcefully held Jane Roe 1 on the floor, laid on top of her exceptionally small body, simulated sex and forcibly kissed her while Jane Roe 1 frantically kicked and struggled to get away from Nancy. Jane Roe 1 suffers from cystic fibrosis, so she was unusually small for her age and was quite frail. The more Jane Roe 1 fought back, the more determined and aroused Nancy became. Nancy threatened Jane Roe 1 by telling her if she made any noise, they would both get in trouble and "really bad things" would happen to Jane Roe 1 and her parents as a result. Nancy used similar manipulative threats and fear tactics every time she abused Jane Roe 1.

118.   Plaintiffs were repeatedly, and interchangeably forced into the closet to watch the other's abuse over the course of approximately 2 years. Every time Nancy had access to Jane Roe 1, she either forcibly French kissed her, groped her, or abused her in some other heinous fashion. Put simply, **the abuse Jane Roe 1 endured at Nancy's hands was relentless**.

119.   Nancy became increasingly violent and constantly sought and found new opportunities to forcibly abuse her, either putting her hands down Jane Roe 1's pants, and/or pinching her breasts, inner thighs and buttocks. On one occasion, in approximately 1994, when Jane Roe 1 was approximately 9 years old, Nancy lifted tiny Jane Roe 1 onto the bathroom countertop at Steve and Diane Brown's (ministry leaders) home and violently molested the child.

120.   At this time, Jane Roe 1 was very ill due to her cystic fibrosis disorder, and she could not defend herself against a person who was roughly 7 years her senior, let alone process the severe and continuous trauma she endured. Nancy took advantage of Jane Roe 1's vulnerability and used her size and strength to overpower Jane Roe 1.

121.   This bathroom incident led to one of the first times that Jane Roe 1 sought help from a church friend regarding Nancy's abuse. After Cindy discovered Jane Roe 1's disclosure of the abuse, she aggressively approached Jane Roe 1 and angrily scolded her by saying "[d]on't you ever talk about my daughter ever again!" That night after Jane Roe 1 arrived home, she discovered that **Mark and Cindy told her parents to ground her for "gossiping" about the Wilkinsons**, which they told her was a sin. **ICOC leaders blamed Jane Roe 1 for "lying" about the abuse and she was constantly instructed to "forgive and move on," and commanded to never say anything negative about the Wilkinsons.**

122.   By way of another example of Nancy overpowering Jane Roe 1 against her will, when Jane Roe 1 was very sick and the lights were off at a church "movie night", Nancy aggressively rubbed Jane's vagina and tried to force Jane Roe 1 to rub Nancy's vagina.

123. Jane Roe 1 was abused, tortured, stalked and threatened by Nancy Wilkinson for most of her childhood and early adolescence. Jane Roe 1 made every effort to avoid Nancy, however, since they were in the same church group, staying away from Nancy was impossible.

124. When Jane Roe 1 was approximately 11 or 12 years old, the Wilkinson Family moved into Plaintiffs' home for approximately one month. During this period of cohabitation, **Nancy's brother, Marty Wilkinson, also groomed and abused Jane Roe 1**. Marty's abuse continued into Jane Roe 1's high school years and finally ended when Marty left for college. Marty's sexual abuse of Jane Roe 1 lasted approximately 6 years, however, the verbal abuse continued for several years thereafter.

125. **Marty frequently walked into the bathroom while Jane Roe 1 was showering and stared at her naked body**. He would also turn off the lights while she was in the middle of her shower, which forced her to stumble out of the shower naked and turn the light on, all while he watched her. On more than one occasion, he took her towel and held it, and forced her to walk out of the shower naked to retrieve the towel from him. **Marty's shower abuse was humiliating and left Jane Roe 1 in a constant state of fear and anticipation regarding the abuse she would have to endure next**.

126. Marty Wilkinson, a popular football player, cornered Jane Roe 1 at high school and intentionally publicly humiliated her on numerous occasions by loudly making sexual remarks for everyone to hear and embarrassing her by doing crude sexual simulations in the hallways. **Marty pulled her shirt down in front of students and exposed her cleavage**. At school and other places, Marty frequently put his hands over her breasts, forced his hand between her legs, grabbed her buttocks or groped her in some fashion.

127. **Jane Roe 1 continued to report the abuse to numerous ICOC members and leaders, all to no avail**. Cindy Wilkinson told Jane Roe 1 that she was "not allowed to tell anyone or report the abuse". **Anne-Brigitte Taliaferro, the church leader and Mike's wife, specifically told Jane Roe 1 that she was upset with her,**

1  and had not forgiven Jane for "threatening to pursue legal action."

2   128.   The Wilkinson Family was/is angry, predatory, entitled, and deceitful;
3  Jane Roe 1 is afraid of them to this day, which is one of many reasons why she is
4  unwilling to reveal her name herein. It was generally understood among the
5  congregation that **the Wilkinson Family was untouchable and no one was allowed**
6  **to disparage them in any manner, even if the allegations were true**. People in the
7  church were repeatedly told that if they: "had issues with Marty, they had to go through
8  Mike Taliaferro first." Marty was routinely called "Mike's Golden Boy."

9   129.   When Jane Roe 1 was approximately 12 or 13 years old and when Jane
10  Roe 2 was 15 or 16 years old, Plaintiffs worked at the Wilkinson's cleaning business
11  where approximately 5-10 other teens from the ICOC teen ministry would clean
12  overnight at various businesses serviced by the Wilkinson Family. These teen workers,
13  including Plaintiffs, were never compensated for their labor. The church leaders told
14  the girls that it was their "privilege to serve The Wilkinsons."

15   130.   During these free labor cleaning nights, Marty frequently terrorized and
16  sexually threatened Plaintiffs. Plaintiffs recall several times when they bent over for
17  some reason (e.g., to pick up trash), Marty seized the opportunity to grab their hips and
18  thrust his penis against their buttocks or pelvis to simulate sex. He would also grab their
19  heads and pretend to push them into his lap to simulate oral sex. He also embarrassed
20  Jane Roe 1 by pretending to ejaculate on/over her.

21   131.   Marty entertained himself by humiliating Jane Roe 1 at every opportunity,
22  as his sexual acts and overtly sexual language were inevitably accompanied by his
23  hysterical laughter, taunting his powerless victim. Marty justified his abuse by making
24  comments such as: "[w]ith that body you should expect to be groped or assaulted!"

25   132.   During the numerous instances of abuse, Jane Roe 1 was extremely ill, as
26  she was constantly in and out of the hospital because of her cystic fibrosis, sometimes
27  for months at a time. There were several scary times during Jane Roe 1's childhood and
28  adolescence when she questioned whether she would survive. **Her health was so**

**fragile and volatile that she received "end of life" counseling when everyone feared the worst**. The Wilkinson Family was cruel and inhumane insofar as they took advantage of a sickly child during her most vulnerable time, both physically and emotionally. She dreaded going to the Wilkinson Family home and on one occasion, she was too afraid to enter the home and instead sat on their front porch coughing up blood while waiting for her parents to pick her up.

133.   In or about 2003, Defendant Mike Taliaferro ("Mike") and his wife Anne Brigitte Taliaferro moved to town to lead the San Antonio ICOC, which was later renamed Mission Point Christian Church. Defendant Mission Point Christian Church remains closely affiliated with ICOC and partners with HOPEWorldwide.

134.   On information and belief, Mike Taliaferro also has direct partnerships and business dealings with HOPEWorldwide. Plaintiffs mistakenly and naively believed that the new Taliaferro leadership could turn the tide and they would have allies to help end or report the longstanding, unmitigated Wilkinson Family abuse. Indeed, that was not the case.

135.   When Mike first learned of Plaintiffs' abuse, he feigned alarm and promised he would help the girls, yet refused to report the abuses to the authorities because Plaintiffs needed to "forgive" the Wilkinson Family and move on.

136.   Mike Taliaferro lied to Jane Roe 1 during a phone conversation wherein he told her that he called child protective services about the abuse, however, that was a lie. Jane Roe 1 contacted child protective services and learned that there was no record of a report from Mike. According to Mike, he sought advice regarding the abuse from Jacob Sanchez, an ICOC member who worked for child protective services. Mike also told Jane Roe 1 that he reported the abuse to ICOC key leaders Frank Kim, Roger Lamb and Roddy Oaks and their local church board and the ICOC staff lawyer.

137.   Several other ICOC members, including mandatory reporters such as doctors and counselors, became aware of Plaintiffs' abuse, yet did nothing. ICOC Elders Bill and Sally Hooper pretended to be shocked by what they learned about the

Wilkinson Family's shocking history of abuse against Plaintiffs, however, they also failed to report the abuse to the authorities.

138.   Dave Potca, was a church staff member and served as the Youth and Family leader; he currently serves as an ICOC ordained teacher and consultant. **Dave was also aware of Plaintiffs' abuse, yet defended Marty at every turn and refused to report the abuse to authorities**.

139.   The following is a list of individuals, including mandatory reporters, within ICOC who were aware of Plaintiffs' abuse, yet they never reported the abuse to the authorities:

- Steve and Diane Brown (leaders of the church 1991-1994 est.)
- Bill and Sally Hooper (Elders in Dallas)
- Mike Taliaferro and Anne-Bridgette Taliaferro (leaders in San Antonio 2003-current)
- Carlos Quiroz (pediatrician present at a meeting in 2006 regarding the abuse)
- Clay and Nancy Wilkinson (Mark's brother and sister-in-law)
- Luke Wilkinson (Mark and Cindy Wilkinson's youngest child)
- Nadine Templer (contacted Jane Roe 1 through Facebook after hearing rumors about the Wilkinsons)
- Tom and Lori Ziegler (current Elders and Board members who admitted to discussing the abuse with others)
- Dan and Lori Nabors (close friends for many years; current Elders who admitted to discussing the abuse with others)
- Herve Fluerant and wife Janet Fluerant (current leaders)
- Jeff and Amanda Henderson (previous leaders in San Antonio; now working for the church in Brazil)
- Dave and Beth Pocta (Teachers and leaders with authority)
- Harry Lindsay (board member)
- Joe Cole (board member)

- Nate Bigbee (previous leader now working for the church in Corpus Christi)
- Sunil Punjabi (board member)
- Mike Sandoval (board member)
- Jacob and Michelle ("Misha") Sanchez (Jacob worked for child protective services and advised the church about the abuse in 2006)
- Carmen Garcia (Bible talk leader in 2006; Carmen attended a meeting with both sisters in 2006)
- Larry and Shelly Anthis (previous leaders; Larry was a board member)
- Jerry Condra (board member)
- Trudy Menke (board member and church administrator. She told Jane Roe 1 that she was instructed to call the "church lawyer in California")
- Robert Carrillo (previous leader in San Diego and Director of HopeWorldwide in 2017)
- Lisa Crerie (former volunteer in Kid's Kingdom; she told leadership that Mark should not serve and was removed from leadership as a result)
- Becky Quiroz (primary care physician also director of HopeWorldwide in San Antonio)
- Kerry and Michelle Niester (Bible talk leaders in 2006, and he was a board member)
- Lori Hale (Jane Roe 2's former roommate)
- Karen Louis (Jane Roe 2 sent her an email regarding the abuse, but she never responded)
- Barrett and Rachel O'Connell (Marty's best friends)
- Juan and Laura Aguilar (previous leaders)
- Nick Young (deceased)

140.   Dr. Carlos Quiroz, an ICOC pediatrician, was present during a meeting with Plaintiffs and various church members regarding the abuse. Dr. Quiroz failed to report Plaintiffs' abuse, notwithstanding his knowledge of the same. The church used

Dr. Quiroz and his position as a physician as yet another "reason" why Plaintiffs did not need to report the abuse to the authorities.

141.   Coincidentally, Dr. Quiroz's brother, Luis Quiroz, (also an ICOC member at the time) was convicted for molesting young girls, which Cindy Wilkinson was directly aware of. This evidences the **pervasive nature of the sexual abuse that occurred across a litany of ICOC family of churches**.

142.   Mark and Cindy Wilkinson were eventually asked to leave Mission Point Christian Church, however, they were relocated to the San Diego ICOC. Mike Taliaferro made the following comment to Jane Roe 1 about the Wilkinsons: "I don't really care where they go, as long as they get out of my church." This statement clearly demonstrates that **Mike knew that Mark and Cindy Wilkinson were abusing children**.

143.   On information and belief, the San Diego congregation was not warned about their abusive history. In San Diego, Mark and Cindy Wilkinson continued to oversee parts of the Kids Kingdom ministry and they also worked in and traveled with the HOPEWorldwide ministry.

144.   Plaintiffs contacted HOPEWorldwide in a desperate attempt to get help reporting the Wilkinson Family, as they were gravely concerned because Mark and Cindy were working in the "Open Arms" orphanage in Mexico and also in portions of the Kids Kingdom ministry, and HOPEWorldwide. Jane Roe 1 sent emails to the following individuals within HOPEWorldwide with the subject line "Church Concerns": The Denver ICOC, Mark Ottenweller, Roger Lamb, Robert Carillo, Mike Taliaferro, Herve Fleurant, Ann Brigitte Taliaferro, and Dave Pocta. In the email, **Plaintiffs vulnerably detailed the shameful history of abuse and begged for help**. Not a single person responded to the emails.

145.   Nadine Templer, a longtime ICOC leader, who currently works for HOPEWorldwide, contacted Jane Roe 1 via Facebook. Nadine heard about Jane Roe 1's pleas for help and told Jane Roe 1 that she felt disheartened and exhausted, and she

was fighting a battle regarding the rampant sexual abuse. Nadine conceded that the church was turning a blind eye to the abuse and she agreed that something needed to be done. She also stated that for years, no one would listen to her. She stated that after she contacted Steve Staten (ICOC/HOPE leader) about the abuse, that she had to accept that the matter was out of her hands. Nadine then ceased contact with Jane Roe 1.

146.   Nadine Templer also told Jane Roe 1 that she was nearly disfellowshipped for trying to tackle the litany of issues surrounding sexual abuse within the church. Nadine admitted to personally calling many ICOC leaders to report abuse over the years, but no one would listen or take any action. Nadine also mentioned that there are many recent abuse cases and the abuse is not a "thing of the past." As recent as January 2023, Jane Roe 1 has been forwarded text messages from Nadine, which mentioned the same comments to several other current ICOC members.

147.   Once Jane Roe 1 became engaged to another ICOC member, Marty Wilkinson tried to "warn" Jane Roe 1's fiancé that he should not marry her because Jane was "damaged goods." Marty made this comment because he had firsthand knowledge of the abuse, as his family "damaged" Plaintiffs. Marty went far as to demand that other church members provide him with reports about Jane Roe 1's pre-marriage counseling sessions. Marty made every possible effort to remain in total control of any information about her life.

148.   In or about 1999, Marty Wilkinson began working at the Thousand Oaks Teen Ranch that the ICOC church owned and in approximately 2004, he became Director of the ranch. Over the years, Marty's leadership position gave him access to thousands of vulnerable children through this youth program. In fact, Jane Roe 1 has heard terrifying first-hand stories of abuse inflicted upon innocent children by Marty at the ranch. One example occurred when Marty put batteries inside an empty pillowcase, swung it around and violently hit little boys with the weaponized pillowcase.

149.   On information and belief, **Marty is currently overseeing all of the ICOC campuses across the US, and he is the "Chair" of all ICOC Campus**

**Ministries**. Nancy Wilkinson has also maintained access to children over the years, as she worked in Kids Kingdom, outside organizations involving children, and she also frequently babysat for various ICOC families.

150.   In or about 2020, Plaintiffs defected from ICOC. They both find it almost impossible to trust anyone around them and they have a hard time determining who is safe and who is not. They will be forced to cope with the emotional consequences and the invasive traumatizing memories of the long-standing and pervasive abuse for the rest of their lives.

151.   As a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Jane Roe 1 suffered and continues to suffer a litany of injuries. Among other injuries, Jane Roe 1 has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**The 17-Year Abuse and Torture of Jane Roe 2**

152.   Jane Roe 2 was born in 1981 and she was systematically abused by the Wilkinson Family for approximately 17 years. She is 3 years older than her sister, Jane Roe 1. Her first memory of abuse is an incident that occurred when she was approximately 5 or 6 years old at the Wilkinson Family home by Nancy Wilkinson, who is roughly 4 years her senior. Although this is the first memory, it is probable that the abuse began much earlier and like many young victims of sexual abuse, Jane Roe 2's defense mechanisms have suppressed those memories.

153.   Like her sister, Jane Roe 1, Jane Roe 2 endured what felt like a lifetime of abuse by Nancy and Marty, along with an appalling strategic cover-up orchestrated by Mark and Cindy Wilkinson, Mike Taliaferro, and other ICOC leaders. Indeed, **Defendants covered up Plaintiffs' ongoing, heinous abuse for 17 years and they continue to publicly deny the abuse occurred**.

/ / /

154.   In Jane Roe 2's first cognitive memory of abuse, Nancy Wilkinson aggressively held Jane on the floor, laid on top of her, firmly pressed Jane Roe 2's little body into the floor as she frantically squirmed and struggled to get away from Nancy. The more Jane Roe 2 fought back, the more determined and excited Nancy became. **Nancy was approximately 10 years old at the time and she forcefully inserted her fingers inside Jane Roe 2 and shoved her tongue in her mouth, which prevented Jane Roe 2 from screaming for help. While assaulting Jane Roe 2, Nancy threatened the child and said that if she made any noise, they would both get in trouble and "really bad things" would happen to Jane Roe 2 and her parents as a result**. Using similar manipulation and threat tactics, Nancy instilled fear in Jane Roe 2 and coerced her into ongoing silence each time they were together.

155.   Around the same time as the first abuse incident at the Wilkinson Family home, Jane Roe 2 also recalls Nancy shoving her in the closet with wooden slats on the doors to watch as Nancy viciously abused her younger sister, Jane Roe 1. Jane Roe 2 watched helplessly from the closet as Nancy molested her younger, physically ill sister in a grotesque manner. Specifically, Jane Roe 2 witnessed Nancy grab her sister (approximately 3 years old at the time), hold her onto the ground, crushing her while forcing her tongue into Jane Roe 1's mouth. **Witnessing her fragile little sister endure such reprehensible abuse has permanently scarred Jane Roe 2**.

156.   The next cognitive memory of abuse occurred at approximately age 7 when Nancy molested Jane Roe 2 by **pinning her to the ground and raping her with foreign objects**. Jane Roe 2 recalls being penetrated with objects such as pencils, a rod of some kind, a Barbie doll and other painful objects. At one point, Nancy attempted to forcibly sodomize Jane Roe 2, but she was able to scream loud enough and fend off Nancy's savage attempts. **As a result of Nancy's repeated rape and other forms of abuse beginning at a young age, the abuse became normalized for Jane Roe 2 and she did not feel safe unless she was out of reach from the entire Wilkinson Family**. To this day, she struggles with safety concerns, anxiety, depression, and other lasting

effects of the severe physical violence and psychological trauma she suffered beginning at the age of 5 and continuing thereafter for approximately 17 years.

157.   Jane Roe 2 was/is a fighter at heart and in the third grade, she mustered the courage to tell a teacher at her public school about Nancy's repeated abuse. For some inexplicable reason, the teacher failed to notify the police or child protective services.

158.   **Mark and Cindy Wilkinson's response to reports of Nancy's rape and sexual abuse was to assemble the children and have Nancy "apologize" to Jane Roe 2**. Authorities were never called and no other corrective action was taken. Indeed, the Wilkinson Family's approach was ratified and promoted by Nick Young, the Dallas ICOC leader at the time. Nick commanded everyone involved to refrain from notifying the police and he said, "the church will handle this." **Nick's word was gospel and no one within the church dared to defy him**, as was customary based on the hierarchical organization of the church and the "discipleship" structure that facilitated the systematic abuse of children within the church for decades.

159.   One month after the "apology", Nancy resumed abusing Jane Roe 2, however, she was much more hostile and aggressive as retaliation for Jane Roe 2's pleas for help. **The intensity, severity and frequency of Nancy's abuse escalated** into unchartered territory.

160.   Jane Roe 2 endured a litany of abuse by Nancy such that every time Nancy had access to Jane Roe 2, she either forcibly French kissed her, groped her, or abused her in some other reprehensible fashion. **Nancy's abuse of Jane Roe 2 was unrelenting and overwhelming for a young child who was intentionally isolated from "outsiders"** (i.e., anyone who was not an ICOC member or recruit).

161.   For example, on a 1990 trip to Los Angeles for a church wide ICOC convention, Jane Roe 2's family carpooled with the Wilkinson Family. As a result, Jane Roe 2 was forced to lie in the back of the truck canopy area with Nancy. Unfortunately for Jane Roe 2, there was a mattress in the back canopy area and Nancy was in a

strategic position to abuse Jane Roe 2 yet again. **During the drive from San Antonio to Los Angeles, Nancy repeatedly rubbed Jane Roe 2's entire body and forcibly inserted her fingers inside Jane Roe 2's vagina**.

162.   **Jane Roe 2 was abused, stalked and threatened by Nancy Wilkinson throughout her childhood and early adolescence**. Jane Roe 2 attempted to avoid Nancy, as much as a child her age could, and this **constant evasion of her abuser substantially altered her psyche and the nature of her existence, both as a child and as an adult**. Nancy and Jane Roe 2 attended the same church and they were in the same church group, which made navigating this delicate situation even more confusing and troublesome for little Jane Roe 2.

163.   When Jane Roe 2 was in the 7th or 8th grade, the Wilkinson Family moved into Plaintiffs' family home during a time when Mark and Cindy were in between homes. **During this period of cohabitation, Nancy's brother, Marty Wilkinson, began abusing Jane Roe 2**. Marty's abusive behavior continued throughout Jane Roe 2's high school years until Marty eventually left for college.

164.   Marty's abuse of Jane Roe 2 was substantially similar to her sister's abuse, regrettably. For example, Marty would enter the bathroom while Jane Roe 2 was showering and stare at her naked body. Other times while she was showering, Marty would enter the bathroom, turn off the light, which forced her to get out of the shower naked and turn on the light – all while Marty intently glared at Jane Roe 2's wet, nude body. On more than one occasion, Marty took Jane Roe 2's towel and forced her to walk naked out of the shower to retrieve the towel from him. Marty's abuse was nothing short of humiliating for Jane Roe 2.

165.   Marty Wilkinson also cornered Jane Roe 2 at high school and publicly humiliated her on numerous occasions by making **crude sexual remarks and performing disgusting sexual simulations in the hallways**. Marty also humiliated her by **pulling her shirt completely down in front of other students and exposing her cleavage**.

166.   Jane Roe 2 has vivid memories of Marty molesting her at least two other times. On one occasion, he forced himself on top of her on a desk inside one the buildings they were cleaning. There was no one around to defend her, however, she was able to fight him off and ran away before he could injure her further. Marty also grabbed her breasts and/or groped her at every possible opportunity, in addition to his frequent and humiliating overtly sexual comments directed at her both in public and privately.

167.   Notwithstanding Defendants' perpetual thwarting of her attempts to stop the abuse, Jane Roe 2 was undeterred and desperately continued contacting several individuals within ICOC with pleas for help to end the abuse by Nancy and Marty. Concurrently with these efforts, **Cindy Wilkinson made it abundantly clear that Jane Roe 2 was prohibited from discussing the abuse and torture with anyone**.

168.   Jane Roe 2's family was convinced to hold the Wilkinson Family in the highest of regards and to never utter a negative word about the family. Anytime Jane Roe 2 solicited help regarding the ongoing abuse or disclosed the abuse to *anyone* within the church, she was immediately rebuked and blamed for speaking up. The Wilkinson Family was angry, hostile, predatory, entitled, and deceitful such that Jane Roe 2 described their home as a "house of horrors". Consequently, **Jane Roe 2, in spite of her current age, remains afraid of the Wilkinson Family**. She is so afraid of the family's far-reaching power and vast resources (ICOC) that she is unwilling to disclose her name in this Complaint.

169.   Even in her adult years, after Jane Roe 2 became engaged, somehow the Wilkinson Family managed to insert themselves into her life by insisting on being part of her wedding. Even more concerning is **the family's insistence that Mark, Cindy, Nancy and Marty's wife, Daonna Wilkinson,  conduct "marriage counseling" sessions with Jane Roe 2 and her new husband regarding their sex life**. Jane Roe 2, as a result of the family's possessive and inappropriately invasive conduct, felt like nothing more than a piece of Wilkinson Family property.

170.   Due to the history of abuse, Jane Roe 2 has been forced to deal with crippling anxiety, panic attacks, depression and suicidal thoughts, among other things. In 2009, she was almost hospitalized for suicidal ideations and prescribed anxiety medication. In 2016, she was prescribed anxiety medications again for panic attacks and suicidal thoughts. Notwithstanding the foregoing, she continues to courageously battle the challenging effects of nearly two decades of grotesque physical and psychological abuse. Jane Roe 2's numerous attempts to make her voice heard in the past fell on deaf ears for *decades*. This ends now.

171.   As a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Jane Roe 2 suffered and continues to suffer a litany of injuries. Among other injuries, Jane Roe 2 has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

## **FIRST CLAIM FOR RELIEF**
## **SEXUAL ASSAULT OF A MINOR**
*(Against All Defendants and Does 1-100)*

172.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

173.   Defendants intentionally, willfully, and maliciously sexually assaulted and/or sexually abused and molested Plaintiff during the time that Plaintiff was a minor.

174.   In committing the unlawful acts of sexual assault against Plaintiff, Defendants intended to put Plaintiff in imminent apprehension of harmful or offensive contact.

175.   Defendants put Plaintiffs in imminent apprehension of such harmful offensive contact as Plaintiffs actually believed Defendants had the ability to make

harmful or offensive contact with plaintiff's person.

176.   Plaintiffs did not consent to Defendants' intended harmful or offensive contact with plaintiff, Defendants' intention to put Plaintiffs in fear of imminent apprehension of such contact, plaintiff was a minor during the time herein alleged and, therefore, lacked the ability to consent to sexual contact with any person, including Defendants.

177.   As a direct and legal result of this conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

178.   Defendants conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish, and emotional and physical distress.

179.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages in an amount to be determined by the Court.

### SECOND CAUSE OF ACTION
### VIOLATION OF PENAL CODE 647.6(a)(1)
*(Against All Defendants and Does 1-100)*

180.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

181.   California Penal Code § 647.6(a)(1) provides that "[every person who aims or molests any child under 18 years of age shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not

exceeding one year, or by both the fine and imprisonment."

182.   As alleged herein, Defendants engaged in sexual penetration with Plaintiffs while Plaintiffs were under eighteen years of age, in violation of California Penal Code § 647.6(a)(1).

183.   Under California law, victims of childhood sexual abuse are entitled to bring civil actions for violations of Penal Code provisions that prohibit adults from engaging in sexual acts with minors, including Penal Code § 647.6(a)(1). See *Angie M. v. Superior Court*, (1995) 37 6 Cal.App.4th 1217, 1224-1225.

184.   Defendants above-noted actions in annoying and molesting the minor Plaintiffs was the proximate and legal causes of physical, psychological, emotional, and economic damages Plaintiffs have suffered and continues to suffer to this day. It also has resulted in Plaintiffs incurring, and will require Plaintiffs to incur into the future, expenses for medical and psychological treatment, therapy, and counseling.

185.   The above-described conduct of Defendants was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety of Plaintiffs, and was carried out with a conscious disregard of Plaintiffs right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code section 3294, entitling Plaintiffs to punitive damages against Defendants  in an amount appropriate to punish and set an example of them.

### THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Against All Defendants and Does 1-100)*

186.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

187.   The conduct of all Defendants as set forth in this Complaint was extreme and outrageous, and committed with the intention of causing, or reckless disregard of

the probability of causing, emotional distress.

188.   A reasonable person would not expect or tolerate the sexual assault committed by Defendants.

189.   A reasonable person would not expect, accept or tolerate Defendants' unlawful sexual assault and/or sexual abuse, and molestation of Plaintiffs.

190.   Defendants' conduct exceeded all bounds of that usually tolerated in a civilized community.

191.   Defendants intended to cause Plaintiffs injury when they sexually assaulted Plaintiffs, manipulated and brainwashed Plaintiffs into silence and actively concealed Plaintiffs' abuse.

192.   Plaintiffs have suffered severe and/or extreme distress as a result.

193.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

194.   Defendants' conduct described herein was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish and emotional and physical distress.

195.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are, therefore, entitled to the recovery of punitive damages, in an amount to be determined by the Court.

/ / /

/ / /

/ / /

/ / /

## **FOURTH CAUSE OF ACTION**
## **NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
### *(Against All Defendants and Does 1-100)*

196.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

197.   At all times relevant, a special relationship existed between Defendants and Defendants, because Defendants were the agents of Defendants, each of whom had the ability to control of Defendants' conduct, yet failed to exert it. In doing so, Defendants created a widespread culture of acceptance of the abuse of children, as Defendants and Defendants collectively brainwashed and manipulated Plaintiffs to remain silent about the abuse and these Defendants also actively concealed the abuse to avert discovery by the authorities.

198.   At all times herein, Defendants, and each of them, negligently supervised, managed, and controlled Defendants in their membership and participation in Defendants' Church, and negligently failed to warn Plaintiffs, Plaintiffs' parents, and other members of the Church, of the propensity and risk that Defendants would sexually assault, sexually abuse, and/or molest minor children, a propensity and history of which Defendants, and each of them, acting through their employees, agents, and volunteers, had actual notice.

199.   During the same time period, Defendants, and each of them, were negligent in failing to exercise reasonable care to protect Plaintiffs, and other minors, who were members of, or participants in, activities at Defendants' Church, from the risk of sexual assault, sexual abuse and molestation by perpetrators, including Defendants.

200.   Defendants were further negligent in failing to notify law enforcement and other appropriate authority that Plaintiffs were and/or continued to be a victim of child abuse/assault by Defendants when they learned of this fact. Defendants' failure

to report the known and/or reasonably suspected child abuse of Plaintiffs, but instead Defendants perpetuated and facilitated Defendants continued sexual abuse and/or sexual assault, and molestation of Plaintiffs.

201.   If Defendants satisfied their duty to take reasonable steps to protect Plaintiffs all minor children, from known and/or foreseeable harm, including sexual assault, including reporting the sexual assault and/or sexual abuse, and molestation to law enforcement, then some or all of the Plaintiff's injuries would have been avoided.

202.   Prior to, during, and after the sexual assault of Plaintiffs, Defendants, through their administrators, employees, agents, and/or volunteers, had knowledge, and/or were otherwise on notice, that  Defendants had and/or was engaged in, and/or presented the risk of, sexual assault of Plaintiffs, and other minors.

203.   Plaintiffs are informed, believes, and thereupon alleges that prior to, and during Defendants' sexual assault and/or sexual abuse, and molestation of Plaintiffs, Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of Defendants' unlawful conduct, as set forth in this Complaint, but failed and/or refused to take any affirmative action, including but not limited to notifying law enforcement. Instead, Defendants directed Plaintiffs and Plaintiffs' parents to continue to have contact with Defendants thereby ratifying and facilitating Defendants continued sexual assault and/or sexual abuse and molestation of Plaintiffs.

204.   Defendants breached their duties by failing to use reasonable care to protect Plaintiffs from their pastor, deacon, employee, and/or agent, to wit, Defendants.

205.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against her and the resulting harm.

206.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all

such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

207.   Plaintiffs are informed, believes, and thereupon alleges that Defendants' failure to respond, investigate, terminate Defendants' employment, report, or take any other action following Plaintiffs, other minor children, and Plaintiffs parents' report of sexual assault and/or abuse by Defendants was part of Defendants' concerted effort to cover up and/or hide evidence related to childhood sexual assault of minor children, including Plaintiffs.

208.   Plaintiffs' damages as a result of Defendants repeated sexual assault, abuse, and molestation of Plaintiffs was a direct result of Defendants' concealment and cover-up. As such. Plaintiffs are entitled to treble damages against Defendants pursuant to Code of Civil Procedure section 340.1(b)(2).

## FIFTH CAUSE OF ACTION
## NEGLIGENT SUPERVISION OF A MINOR
### *(Against All Defendants and Does 1-100)*

209.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

210.   Defendants and McKean and Lucas (McKean and Lucas are collectively, the "Church Leader Defendants"), and each of them, were responsible for the care, custody, control, supervision, and protection of the minor children entrusted to them, including Plaintiffs. Defendants had a duty to adequately and properly supervise, monitor, and protect Plaintiffs from known and knowable dangers, such as those posed by Defendants.

211.   Defendants, and each of them, breached their duty to properly and adequately supervise, monitor, and protect Plaintiffs, in part because officers, administrators, agents, and other supervisory employees knew or should have known of Defendants' improper behavior, including that minor children, including Plaintiffs,

were frequently alone with Defendants without any justification, that Defendants would frequently touch and sexually abuse minor children, including Plaintiffs, at Defendants' Churches without any justifiable reason for doing so, including when the minor children were by themselves, and Defendants sexually abused, assaulted, and/or molested minor children, including but not limited to Plaintiffs.

212. Defendants, acting through their administrative and supervisory employees, knew or should have known that Plaintiffs were unattended and unsupervised with Defendants on numerous occasions, without any justification.

213. It should have been obvious to any officer, agent, administrator, employee, or staff member that there was no reason that neither Plaintiffs, nor any other child, should have been alone with Defendants. The employees and agents of Defendants instead turned a blind eye to the fact that Defendants were spending time with minor children, including Plaintiffs, unattended and unsupervised without any investigation into the matter.

214. After engaging in grooming activity of Plaintiffs while spending time alone with Plaintiffs, Defendants started sexually assaulting, sexually abusing, and molesting Plaintiffs and other minor children on Defendants' premises and during Defendants' church related services. The acts of sexual assaults and abuse occurred while Plaintiffs were left unattended and unsupervised with Plaintiffs.

215. If Defendants, and each of them, adequately and properly supervised, monitored, and protected Plaintiffs, Plaintiffs would not have been harmed, or would not have been harmed to the extent that Plaintiffs were.

216. Defendants also recklessly and negligently failed to implement and/or enforce policies and procedures that were aimed at preventing or detecting sexual assault and assault of their minor members.

217. If Defendants adequately performed their duties and responsibilities, then Plaintiffs would not have been subject to the sexual assault, assault and harassment perpetrated by  Defendants.

218.   Plaintiffs have been severely damaged emotionally and physically, and otherwise, in amounts to be proven at the time of trial, but which exceed the jurisdictional limits of the Superior Court as a direct and legal result of the acts and omissions of Defendants, and each of them.

**SIXTH CAUSE OF ACTION**
**FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP. BASED ON VICARIOUS LIABILITY**
*(Against All Defendants and Does 1-100)*

219.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

220.   Defendants knew or reasonably suspected that Defendants had, and or was, engaged in the sexual assault of children while the children were under the care, custody, and supervision of Defendants, and each of them, and thus had a duty to report Defendants to the appropriate authorities under the California Child Abuse and Neglect Reporting Law. (Penal Code §§ 11164-11174.3, "CANRA".)

221.   At all times relevant herein and material hereto, Defendants were employees of the other Defendants. Defendants were responsible for hiring, training, supervising, and retaining Defendants as part of their church and youth bible studies program. Defendants and their staff, employees, and administrators were required to report any suspected child or sexual abuse as part of their duties and responsibilities as employees and/or agents of Defendants.

222.   Defendants' and their administrators, board members, and employees are mandated reporters under Penal Code section 11165.7.

223.   Penal Code section 11166(a) states that a mandated reporter shall make a report to an agency whenever he/she, in his/her professional capacity or within the scope of his/her employment, has knowledge of or observes a child whom the mandated reporter knows, or reasonably suspects has been a victim of child abuse or

neglect. "Reasonable suspicion" does not require certainty that child abuse or neglect has occurred but looks to if it is objectively reasonable for a person to entertain a suspicion to suspect child abuse or neglect. (Penal Code § 11 lr66(a)(l).)

224.   As set forth in this Complaint, Defendants knew and/or reasonably suspected that children had been sexually assaulted by Defendants, prior to Defendants' sexual assault of Plaintiffs, giving rise to a duty to report such conduct under CANRA.

225.   Defendants, including their administrators, board members, and employees knew that in the absence of the exercise of reasonable diligence, that an undue risk to minors, including the Plaintiffs, existed because Defendants' administrators, board members, and/or employees did not comply with California's mandatory reporting requirements.

226.   Defendants, through their administrators, board members, and employees, failed to report the known and/or reasonably suspected child molestations and assaults, created the risk and danger contemplated by CANRA, and a result, unreasonably and wrongfully exposed Plaintiffs and other minors to sexual molestation and abuse,

227.   If Defendants, through their administrators, board members, and employees complied with CANRA's mandatory reporting requirements, then Plaintiffs would not have been harmed at all or to the extent that she was.

228.   As a direct result of Defendants failure to comply with CANRA's mandatory reporting requirements, through their administrators, board members, and employees. Defendants wrongfully denied the Plaintiffs the intervention of child protection services and constituted a per se breach of Defendants, through their administrators, board members, and employees, duties to Plaintiffs.

229.   As a direct and legal result of Defendants and Church Leader Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries,

past and future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## SEVENTH CAUSE OF ACTION
### NEGLIGENCE
*(Against All Defendants and Does 1-100)*

230.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

231.   Defendants owed a duty of care to the minor Plaintiffs or had a duty to control the conduct of Defendants by way of the special relationship existing between those individuals and Plaintiffs.

232.   Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the misconduct and sexually predatory behavior of Defendants directed towards minor children, including Plaintiffs.

233.   Despite having knowledge of the misconduct of Defendants, all Defendants herein failed to take any preventative action to control, curb, and/or prevent that conduct, failed to warn Plaintiffs or Plaintiffs' parents of that wrongful conduct, and/or failed to notify law enforcement, despite having a legal duty to do so.

234.   As a direct and legal result of Defendants' negligence, Plaintiffs were sexually assaulted, sexually abused, sexually harassed, and assaulted by Defendants.

235.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against Plaintiffs and the resulting harm.

236.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and-future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

**<u>EIGHTH CLAIM FOR RELIEF</u>**
**Violation of Federal Racketeer Influenced and Corrupt Organization ("RICO")**
**Act 18 U.S.C. § 1962(c)**
*(Against All Defendants and Does 1-100)*

237.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

238.   Plaintiffs bring this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.

239.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

240.   The Abuse Enterprise, distinct from Defendants, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual bishops, and headquartered in Los Angeles, California.  Members of the Abuse Enterprise maintain a common purpose of extracting money from its members and perpetrating sexual abuse upon minor children under the auspices of liturgical praxis and writings taught by its church ministers worldwide. The Abuse Enterprise began as early as 1979 and continues with a growing global membership of more than 120,000 today.

241.   Defendants have conducted and participated in the affairs of the Abuse Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

242.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260.

/ / /

243.   Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the Abuse Enterprise.

244.   Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts.

245.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts:  (i) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (ii) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); and (iii) sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260 Upon information and belief, several hundred children have been sexually exploited as a result of this pattern of racketeering behavior.

246.   Upon information and belief, hundreds of individuals within Defendants' inner circles have been extorted through fear of financial and physical injury into making large financial payments to Defendants and into providing sexual services to Defendants as a result of this pattern of racketeering behavior.

247.   Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

248.   Upon information and belief, Defendants' pattern of racketeering behavior has been related and continuous since its inception.  Upon information and belief, there is not only a threat of continued criminal activity, but continued criminal activity is occurring within the Abuse Enterprise at the hands of nearly all Defendants as of the writing of this Complaint.

/ / /

249.   Defendants and the Abuse Enterprise regularly move goods, money, and people across state lines, and are therefore engaged in interstate commerce.

250.   As a direct and proximate result of these patterns of racketeering behaviors, Plaintiffs have sustained damages, including lost wages, loss of economic opportunity, loss of educational opportunity, loss of future income, loss of specific extorted payments, physical injury, severe emotional distress, and additional economic losses.

251.   Plaintiffs are therefore entitled to recover treble the damages she sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

### NINTH CLAIM FOR RELIEF
**Sexual Battery in Violation of Cal. Civ. Code § 1708.5**
*(Against All Defendants and Does 1-100)*

252.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

253.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 1708.5, which prohibits sexual battery.

254.   Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

255.   As alleged herein, Plaintiffs the victim of sexual battery as a minor perpetrated by Defendants. Defendants subjected Plaintiffs to this sexual battery at the hands of while Plaintiffs were minors.

/ / /

256.   Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

257.   Defendants knowingly conspired and/or aided and abetted to force Plaintiffs into sexual battery with Defendants, and such sexual battery did, on multiple occasions, occur.

258.   Plaintiffs were minors minor when Defendants sexually battered them.

259.   Each Defendant knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of sexually battering Plaintiffs and in furtherance of the Abuse Enterprise.

260.   The sexual battery of Plaintiffs by Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

261.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

262.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care. Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

263.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees, and other relief that the Court may deem proper.

/ / /

**TENTH CLAIM FOR RELIEF**
**Gender Violence in Violation of Cal. Civ. Code § 52.4**
*(Against Defendants and Does 1-100)*

264.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

265.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

266.   Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the California Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023, the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

267.   As alleged herein, Plaintiffs were the victims of multiple instances of sexual battery as a minor perpetrated by Defendants and facilitated by all Defendants herein. Defendants subjected Plaintiffs to these multiple incidents of sexual battery at the hands of Defendants while Plaintiffs were minors.

268.   Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

269.   As alleged herein, Plaintiffs were repeatedly the victim of acts of gender violence by Defendants while they were minors.

270.   Each Defendant herein knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of committing acts of gender violence against Plaintiffs.

271.   The repeated sexual battery of Plaintiffs by Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

272.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

273.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

274.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees and other relief that the Court may deem proper.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray for relief as follows:

(a)   Compensatory and special damages in an amount to be proven at trial;

(b)   Statutory penalties and liquidated damages according to proof at time of trial;

(c)   Punitive and exemplary damages in an amount according to proof at the time of trial;

(d)   Treble damages;

(e)   Pre- and post- judgment interest;

(f)   Reasonable attorney's fees and costs; and

(g)   Such other and further relief as the Court deems just and proper.

Plaintiffs respectfully demand a trial by jury on all claims so triable.

**SAMINI BARIC KATZ LLP**

Date: February 1, 2023            By:    */s/ Bobby Samini*
                                         Bobby Samini
                                         Michael Katz
                                         Steve Baric
                                         Nicole C. Prado
                                         John S. Oney, IV,
                                         Attorneys for Plaintiffs